## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WAYNE RESPER,                              *

Plaintiff                                 *

v                                         *        Civil Action No. PJM-17-2014

WEXFORD HEALTH SOURCES, INC.,             *
BRENDA REESE, R.N.,
BEVERLY McLAUGHLIN, R.N.                   *
CARLA BUCK, R.N.,
ALAN WILT, R.N.,                          *
DIANE HENSEL, R.N.,
BURNICE SWAN, R.N.,                       *
RYAN BROWNING, R.N.,
WARDEN RICHARD GRAHAM, JR.,               *

Defendants

***

## MEMORANDUM OPINION

Plaintiff Wayne Resper, currently incarcerated at Jessup Correctional Institution ("JCI") in Jessup, Maryland, has filed a civil action against Wexford Medical Services ("Wexford"), Brenda Reese, R.N., Beverly McLaughlin, R.N., Carla Buck, R.N., Alan Wilt, R.N., Diane Hensel, R.N., Burnice Swan, R.N., and Ryan Browning, (collectively, the "Medical Defendants") and Warden Richard Graham, Jr.. In his Complaint, as amended, Resper asserts a violation of his constitutional rights arising from Defendants' alleged failure to properly treat an ulcerous wound on his left leg while he was housed at Western Correctional Institution ("WCI") in Cumberland, Maryland. Pending before the Court is the Medical Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, which is fully briefed (ECF No. 35; renewed at ECF No. 105) and Warden Graham's Motion to Dismiss, or Alternatively, for Summary Judgment. ECF No. 37. Resper has

responded.[1] ECF Nos. 69 and 103.[2]  Medical Defendants have replied.  ECF No. 104.  Upon review

of the submitted materials, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.

For the reasons set forth below, the Medical Defendants' Motions, construed as Motions for

Summary Judgment, ARE GRANTED.

## BACKGROUND

In his Amended Complaint (ECF No. 26) Resper alleges that unspecified Defendant

Medical Providers failed to prevent an ulcerous wound on his left leg from reopening.  ECF No.

26.  He claims as a result he suffers from nerve damage, significant damage to his leg, and is under

threat of amputation or loss of life.  *Id*.  Resper also claims that unidentified Medical Defendants

admitted him to the prison infirmary which exposed him to methicillin resistant staphylococcus

aureas (MRSA) and cellulitis infection.  *Id*.  He also claims that Medical Defendants failed to refer

him to a physician to prevent enlargement of the infection and otherwise failed to prevent growth

of the wound.  *Id*.  Additionally, on March 9, 2017, one of the Defendants, unnamed, failed to "dry

---

[1] Resper sought and was granted numerous extensions of time to respond to the dispositive motions.  While the motions were pending Resper was moved between prisons resulting in his mailing documents to the Court for safekeeping and his being separated from his paperwork for several months which resulted in a lengthy delay to the resolution of this case.  *See e.g.* ECF Nos. 38, 40, 42, 43, 54, 56, 57, 60, 63, 66-68, 72, 76, 81-89, 92-96, 98-101.  Ultimately Resper was directed to file his response no later than June 22, 2020 and advised that no further extensions would be granted.  ECF No. 101.  He filed his response on July 14, 2020.  ECF No. 103.

[2] To the extent Resper raises claims not included in the original complaint (alleged denial of medical care occurring in 2012 and 2013; medical care was driven by objective to save money; other inmates experienced delays in treatment; recommendations from wound clinic in July of 2018 were not followed; Medical Defendants retaliated against him by reporting him as non-compliant with his medication; he was prohibited from attending medical appointment due to lockdowns; the administrative remedy process is ineffective; he has been targeted for deliberately indifferent care; Wexford has a policy or custom of deliberate indifference; Wexford has settled cases similar to Resper's in other states which establish a pattern of misconduct), such complaints are outside the initial Complaint, are not properly before the Court, and will not be considered here.

wrap" his wound and on another unspecified date failed to change his dressing. *Id*. Finally, Resper claims that Medical Defendants failed to view and assess his wound in order to compare notes and failed to take accurate records of the wound's composition. *Id*.

Resper has a medical history of deep vein thrombosis, gastroesophageal reflux, microcytosis and hypochromia, bilateral knee pains, and chronic ulcerated stasis dermatitis. ECF No. 35-4. Pertinent to this case, Asresahegn Getachew, M.D. explains that "a stasis ulcer is a breakdown of the skin caused by fluid build-up in the skin from poor vein function. . . .By their nature, stasis ulcers typically heal very slowly over many months or even years. . . .they chronically recur." ECF No. 35-7, pp. 1-2, ¶ 3 (Getachew Affidavit). From August of 2016 to January of 2018, Resper received regular dressing changes and wound cleansing as directed by his medical providers. ECF No. 35-5 (wound care notes); ECF No. 35-6 (wound care summary). Dr. Getachew denies that Resper's ulcer posed a threat of amputation or a threat to his life: while the ulcers required treatment, the more significant danger was due to their susceptibility to infection. ECF No. 35-7, p. 3, ¶ 10. Dr. Getachew also denies that Resper was infected with MRSA as alleged or that health care providers could prevent a stasis ulcer from occurring. *Id*., p. 4, ¶¶ 11 and 12.

Resper's undisputed medical records demonstrate that on July 15, 2015, he was seen by Physician's Assistant (PA) Davis. ECF No. 35-4, pp. 2-3. Resper reported he had a history of a blood clot in his left leg in July of 2012 which caused decreased blood flow. He suffered a scratch in November of 2012 that ulcerated, becoming infected. The ulcer healed, became re-infected in January of 2015, but again the skin healed. *Id*., p. 2. At the time of his encounter with Davis the wound was "resolved" and Resper was provided an ACE wrap to use at night to protect the newly healed skin. TED stocking were also ordered and Resper was instructed to discontinue the use of

the ACE wrap when he received the TED stockings.  *Id*., p. 3.  Two days later, Nurse Martin discontinued Resper's dressing changes.  *Id*., p. 4.

On August 5, 2015, after evaluating Resper, Dr. Barrera recounted Resper's history of stasis dermatitis with recurrent ulceration but noted both ulcers had healed, and there was no evidence of infection.  ECF No. 35-4,  pp. 5-7.  Less than three weeks later, on August 24, 2015, the wound, which was described as superficial measuring 6 x 4 centimeters, had reopened.  *Id*., pp. 8-9.  The skin around the wound was intact, warm and dry, and there was no drainage or swelling.  *Id*.  Nurse Practitioner (NP) McLaughlin ordered that Resper start "unna boots" (a special dressing of gauze impregnated with zinc, glycerin, or calamine that becomes rigid when dry: used to manage leg ulcers).[3]  *Id*.  He was also prescribed Bactrim and Amoxicillin and had active prescriptions for Tylenol Extra Strength and Ultram (aka Tramadol).  *Id*.

Resper was seen again by Dr. Barrera on September 9, 2015.  ECF No. 35-4, p. 10.  At that time the wound was tender and discharging.  Barrera noted that the Bactrim and Amoxicillin were not effective and he prescribed Augmentin, another antibiotic, and ordered the wound cultured. *Id*.  Resper returned to Dr. Barrera on September 21, 2015.  Barrera noted that the wound was tender and not healing despite having been treated with several antibiotics.  *Id*., pp. 12-13. Dr. Barrera prescribed Rocephin intramuscularly for 7 days and continued use of the unna boot dressing.  *Id*.  Resper had active prescriptions for Tylenol ES and Ultram.

NP Washbourne saw Resper on September 29, 2015.  ECF No. 35-4, pp. 14-16.  At that time a small amount of greenish drainage, without foul odor was observed.  She noted that Resper had recently completed the full dose of Rocephin and appeared to be improving.  She directed that

---

[3] *See* https://woundcareadvisor.com/unna-boot/#:~:text=An%20Unna%20boot%20is%20a,in%20patients%20who%20are%20ambulatory. (last visited Sept. 1, 2020).

Resper discontinue use of the unna boot due to maceration and noted that here was a 2 x 2-centimeter area of beefy red granulated tissue and swelling.  *Id*.  She directed Resper elevate his leg as much as possible and keep the area dry. *Id*. She also ordered dressing changes and wound care three times a week. *Id*., p. 15.

Dr. Ottey examined Resper on November 1, 2015, and noted that Resper reported increased drainage and pain in his left leg and that he continued to receive wound care.  ECF No. 35-4, p. 17.  No swelling of the extremities was observed and Dr. Ottey directed that Resper's wound care continue.  *Id*., p. 18.

NP Washbourne evaluated Resper on November 13, 2015.  ECF No. 35-4, pp. 20-23.  The wound was 5 x 4 centimeters with red granulation, no slough (dead or necrosed tissue separating from living tissue), and moist.  *Id*., p. 20.  The wound was cleansed with saline solution and a collagen stimulant powder was placed on the wound.  Washbourne directed the dressing be changed three times a week, added Ensure for extra protein to promote wound healing, and educated Resper regarding venous ulcers, a sore that is very slow to heal due to weak blood circulation in the limb and which can last a few weeks to years.  *Id*.

Dr. Barrera next examined Resper on November 25, 2015.  ECF No. 35-4,  pp. 24-25.  The wound was deepening and edema was observed.  *Id*.  Resper reported tenderness from the knee to his ankle.  Dr. Barrera ordered Rocephin intramuscular twice daily for seven days and restarted the Unna boot treatment.  He also directed that the wound size be measured.  *Id*.  He prescribed Neurontin in addition to Resper's prescriptions for Tylenol ES and Ultram, which remained in effect.  *Id*.

A week later Resper was seen by NP McLaughlin due to complaints of pain and intermittent numbness.  ECF No. 35-4, pp. 26-27.  She resubmitted the nonformulary request for

Neurontin, noted that he was due to be reevaluated at his next visit, and would continue his current care plan.  *Id*., p. 26.  Resper requested an antibiotic but McLaughlin noted no sign of infection and explained that chronic static ulcers were difficult to heal.  *Id*.

On December 7, 2015, Dr. Barrera noted yellowish discharge from the wound and the area was tender. ECF No. 35-4, pp. 28-29.  Dr. Barrera prescribed another course of Rocephin intramuscularly and directed continued use of the Unna boot.  Resper had active prescriptions for Neurontin and Tylenol ES.  *Id*., p. 29.  The following week, Resper's chart was updated to reflect that the culture of Resper's wound was "positive VRE" and resistant to Rocephin: Barrera was to write a new order.  *Id*., p. 30.  On December 28, 2015, Nurse Trenum discussed with the physician renewal of the antibiotic Cipro, which had been started on December 13.  *Id*., p. 31.  Resper had active prescriptions for Tylenol ES, Ultram, and Neurontin.  *Id*.

Resper told Nurse Martin, on January 2, 2016, that he wanted antibiotics but there was no sign of infection and his prescription for Cipro had just ended on December 28.  ECF No. 35-4, p. 32. He continued to receive dressing changes and his wound appeared to be healing well.  Nurse Martin referred Resper to a provider.  *Id*., pp. 32-33.  On January 4, 2016, NP Bilak prescribed Cipro for an additional 10 days, directed continued use of the unna boot, and dressing changes. *Id*., pp. 34-35.  Resper had active prescriptions for Tylenol ES, Ultram, and Neurontin. *Id*.

On January 18, 2016, Resper was seen by NP McLaughlin requesting a "powder renewal" for a groin rash.  ECF No. 35-4, pp. 36-38.  No rash was observed and Resper was directed to purchase the powder from the commissary.  Wound care for the leg ulcer was continued.  *Id*.  He had active prescriptions for pain medication.  *Id*.

On March 22, 2016, Resper's chart was updated reflecting that Dr. Barrera gave verbal orders for wound care, use of the Unna boot, and that Resper's wound be covered with kerlix and

coban.  ECF No. 35-4, pp. 39-40.  He had active prescriptions for Tylenol ES, Ultram, and Neurontin.  *Id*., p. 39.

On April 6, 2016, Dr. Barrera observed that Resper's chronic ulcer began to open and ooze with greenish discharge.  ECF No. 35-4, p. 41.  He noted that the previous wound cultures were positive for enterococcus faecalis, staph aureus, and pseudomonas sensitive to quinolones.  *Id*.  He ordered Cipro 500 mg for 14 days.  *Id*.  Resper had active analgesic pain medication prescriptions. *Id*., p. 43.  The following day Resper's lab report noted that the most recent wound culture was positive for staphylococcus aureus.  *Id*. p. 45.

On April 13, 2016, LPN Wratchford entered a note that she received a telephone order from the provider to discontinue Resper's prescriptions for Neurontin and Ultram as he was throwing them in the trash.  ECF No. 35-4,  p. 46.  Later that day, Dr. Barrera saw Resper.  The ulcer remained open but no puerile discharge was observed.  *Id*., p. 47.  Tenderness and fluctuation of the surrounding area was observed.  After reviewing the last culture, Dr. Barrera ordered both a topical and oral antibiotic: clindamycin gel topical and clindamycin oral.  *Id*., pp. 47-48.  Resper's prescription for Tylenol ES remained in effect.  *Id*., p. 48.  A week later Dr. Barrera evaluated Resper and noted that the ulcer was slightly smaller.  He again reviewed the laboratory cultures and renewed Cipro for 10 days with continued use of ampicillin and clindamycin topically.  *Id*., pp. 49-50.  Resper's prescription for Ultram was renewed.  *Id*., p. 49.  On June 14, 2016, a culture of the wound showed no growth.  *Id*., p. 51.

NP Mahler evaluated Resper on June 16, 2016.  ECF No. 35-4, pp. 52-54.  Resper requested that his prescription for Neurontin be renewed due to sharp leg pain and he denied throwing his medication in the trash.  *Id*.  Plaintiff was advised that the Neurontin could not be renewed and Mahler offered to order Elavil, Nortriptyline, Bymalta or Lyrica, but Resper declined, became

upset, and requested to see a physician. *Id.*, p. 52. He had a current prescription for Ultram, which was renewed at the visit, and Tylenol ES, which he reported helped with pain relief. *Id.* Resper was referred to the physician to discuss renewal of Neurontin. *Id.* On June 20, 2016, NP Mahler entered a chart note that the prescription for Tramadol 200 mg was declined by the clinical pharmacist as not indicated for long term use to relieve chronic pain and Resper had been prescribed Tramadol since March 25, 2015. *Id.*, pp. 54, 57. A tapering doss of Tramadol was prescribed and Resper was provide Tylenol 500 mg. 1-2 twice daily. *Id.*

On June 27, 2016, Resper was seen by Nurse Treuter via telehealth for wound care. ECF No. 35-4, pp. 61-63. He complained of shooting pulses of neuropathic pain. Dr. Barrera gave verbal orders for the dressing to be changed to dry gauze covered with Telfa, light kirlex, Unna boot, and coban. *Id.*, p. 63. The clindamycin ointment was discontinued and Resper was referred to chronic care in two weeks. *Id.* His lab report dated July 1, 2016, found normal skin flora. *Id.*, p. 64. On July 5, 2016 NP Mahler entered a chart update that Resper's plan of care regarding wound care was to continue and that in light of his being weaned from Tramadol his prescription for Neurontin would be resumed. *Id.*, p. 65.

Resper was seen again by NP Mahler on July 12, 2016. ECF No. 35-4, p. 68. Resper requested an MRI and protein supplement for his non-healing ulcer. Mahler noted that Resper had nursing dressing changes three times a week and that he was to change the dressing between nurse dressing changes. *Id.* He was advised that the most recent wound culture was normal. The wound was examined and described as moist, with no yellow or green discharge, with serous discharge but no bleeding or edema. Resper reported that his pain was not controlled with Tylenol and requested Ultram; Mahler submitted a non-formulary request for Ultram and increased his Neurontin prescription. *Id.*

Two days later Resper was seen by Nurse Treuter, the wound care nurse.  ECF No. 35-4, pp. 70-72.  He complained of pain like bolts of pulsing lightening.  Examination showed itchy, peeling, cracking skin, and green tinted drainage.  A slough had formed over an area of 7 x 8.5 cm with drainage noted.  Resper was to be referred to a surgeon for wound debridement.  Ensure was recommended to promote wound healing and it was ordered that the wound be cleansed with normal sterile saline, scrubbed as tolerated, and his dressing be changed to Madi-honey, covered with an abdominal pad, then kerlix.  *Id.*, p. 72.  Nurse dressing changes were to occur three times a week and Resper was to return to the clinic in two weeks.  *Id.*  He had active prescriptions for Neurontin, Tylenol ES, and Ultram.  *Id.*, p. 70.  On July 19, 2016, NP Mahler entered a chart update reflecting that an increase in Resper's Ultram prescription was ordered.  *Id.*, p. 73.

On August 5, 2016, when Resper was seen by Nurse Treuter, he complained that the Medi-honey made his leg feel like sandpaper.  ECF No. 35-4,  p. 74.  On examination the wound showed an erythemic area with short well defined slightly raised borders with signs of infection including increased swelling, drainage, and pain.  *Id.*  Medi-honey was discontinued and the wound care nurse directed that Silvadene be applied thinly, with Telfa, and an Unna boot for three days.  The wound was to be cleansed and the dressing reapplied every three days.  *Id.*, p. 75.  The nurse also contacted the physician in light of the wound not responding to treatment.  *Id.*

That same day NP McLaughlin prescribed doxycycline 100 mg twice daily because Resper's recent lab report showed the wound culture was positive for Acinetobacter bacteria that was sensitive to doxycycline.  ECF No. 35-4, p. 76.  Mahler entered a chart note on August 15, 2016, that Resper was to continue on doxycycline until August 16, 2016 and that he had been prescribed Ultram 300 mg once daily for pain.  *Id.*, p. 77.  She requested renewal of his prescription for Neurontin and reviewed his dressing changes.  *Id.*  On August 19, 2016, Dr. Barrera renewed

Resper's prescription for doxycycline for an additional ten days.  *Id.*, p. 80.  That same day, Resper's left leg was x-rayed and there were no abnormalities of the bones.  *Id.*, p. 81.  Dr. Barrera examined Resper on August 29, 2016, and noted that Resper's ankle-brachial index (ABI), a test which checks for peripheral artery disease,[4] was normal.  *Id.*, p. 82.  Resper's prescriptions for Ultram, Neurontin, and Tylenol ES remained active. *Id.*

Dr. Saleem evaluated Resper on September 15, 2016, in the on-site surgical clinic due to his history for non-healing wounds on his left lower leg.  ECF No. 35-4, pp. 83-84.  Minimal scabs and pigmentation of the skin, with one small ulcer on the back of the left ankle, were observed. Dr. Saleem recommended that the wound be debrided with silver nitrate once weekly and daily Silvadene dressings be applied only on the ulcer.  The rest of the skin was to be treated with cortisone cream and A&D ointment.  *Id.*  Resper was instructed to keep the leg elevated and use stockings.  *Id.*, p. 84.  The following day Resper requested better pain medication from Nurse Martin, who noted he had been seen by the physician the previous day and no medication changes were ordered.  *Id.* p. 85.  Nevertheless Resper was referred to a provider.  *Id.*

NP Mahler evaluated Resper on September 22, 2016.  ECF No. 35-4, p. 87.  She noted that his September 16th wound care showed no exudates and that the wound was healing well with no erythema, drainage or odor.  She also noted that the September 9th culture was positive for "Pseudomonas with pan sensitivity, Serratia Marcescens, Enterococcusus, Faecalis & Beta Hemolytic Streptococcus Group C, sensitive to cipro."  *Id.*  Mahler discussed Resper's treatment with Dr. Barrera and he was started on Cipro 500 mg for 14 days.  Additionally, Mahler advised Resper that she could not increase his dose of Ultram but if his pain persisted they could discuss

---

[4] *See* https://www.mayoclinic.org/tests-procedures/ankle-brachial-index/about/pac-20392934 (last visited Sept. 1, 2020).

increasing Neurontin.  *Id*.  His prescription for Neurontin was renewed and Ultram was approved. *Id*. pp. 87-92.

Dr. Barrera saw Resper on September 30, 2016, and his plan of care, including antibiotics and pain medication was continued.  ECF No. 35-4, pp. 93-94.  Dr. Barrera saw Resper again on October 7, 2016, and applied the silver nitrate treatment recommended by the surgeon.  *Id*., pp. 95-96.

Resper advised NP Washbourne, on November 20, 2016, that Ultram and Neurontin were effective in controlling his pain.  ECF No. 35-4,  pp. 97-99.  Edema at the wound site was observed but his leg pulses were normal.  *Id*., p. 98.  Resper's prescriptions for Ultram, Neurontin, and Tylenol ES were renewed.  *Id*.

On December 14, 2016, Resper was evaluated by NP Mahler in the chronic care clinic. ECF No. 35-4, p. 100.  He refused to allow Mahler to inspect the wound as he did not want to remove the dressing.  *Id*., pp. 100.  He continued to receive daily dressing changes with Silvadene ointment and was receiving Neurontin, Ultram, and Tylenol ES for pain relief.  *Id*.

On December 31, 2016, Resper was sent to Western Maryland Regional Medical Center for incision and drainage of a nasal abscess.  He was placed on IV antibiotic.  The laboratory culture was positive for Methicillin Susceptible Staph Aureus (MSSA).  ECF No. 35-4, pp. 106-107.  The laboratory report of the culture of the nasal abscess showed the bacteria was resistant to Bactrim and sensitive to doxycycline and as such Dr. Barrera discontinued Resper's prescription for Bactrim and doxycycline was prescribed.  *Id*. pp. 104-105.

On March 7, 2017, NP Mahler assessed Resper's leg wound as healed as the wound was completely closed.  ECF No. 35-4, pp. 108-110.  Wound care was discontinued.  *Id*.  Resper's prescription for Ultram had expired on February 20, 2017, and Mahler renewed it.  *Id*., p. 108.  On

March 9, 2017, Dr. Reilly noted that Resper's left ankle wound had healed and a small area was scabbed over. *Id*., p. 111.  Resper was directed to use a protective covering when showering and to use triamcinolone and "kling" dressing. *Id*.  Three weeks later Dr. Reilly again noted that the wound on Resper's left ankle was healed and there was a scab on the inner ankle bone. *Id*., p. 113. Resper was again directed to cover the area when showering and to use triamcinolone ointment with a "kling" dressing. *Id*., pp. 113-114.  Resper had active prescriptions for Neurontin, Ultram, and Tylenol ES. *Id*.

NP Pierce examined Resper on April 23, 2017.  ECF No. 35-4, pp. 115-116.  A 1 x 1 millimeter superficial scratch was seen on the left lateral ankle.  Resper reported that he had a rare skin disease and the wound had tunneled around the ankle.  No redness, swelling, or drainage was observed. *Id*., p. 115.  Pierce advised Resper to clean the area twice a day with soap and water and to cover the area with a band aid which she provided. *Id*.  His prescriptions for pain medication were active and he was prescribed Keflex, an antibiotic. *Id*., p. 116.

On May 15, 2017, Dr. Barrera assessed Resper as suffering from cellulitis of the left lower leg and advised Resper to be admitted to the infirmary for IV medication, however Resper refused to be admitted.  ECF No. 35-4,  pp. 117-118.  As such, Dr. Barrera prescribed Rocephin 1 gm every 12 hours intramuscularly for 10 days and Bactrim, orally, twice a day for 14 days along, with daily dressing changes with Silvadene. *Id*.  Two days later, Resper was admitted to the infirmary for worsening cellulitis. *Id*., pp. 119-120.  The wound was more swollen and redder and initially Resper again refused admission.  After being advised that he would be placed in segregation for refusing housing, he consented to admission. *Id*., p. 119.  Dr. Barrera suspected MRSA, methicillin resistant staph aureus, and ordered IV Vancomycin and Rocephin every 8

hours, while he waited results of the wound culture.  Resper refused to have his vital signs taken. *Id*.

During his stay in the infirmary Resper received regular skilled nursing care.  ECF No. 35-4, pp. 121-129, 135-37, 146-152.  On May 19, 2017, Dr. Ashraf noted that Resper had Vancomycin and Rocephin IV and that there was no wound discharge.  *Id*. pp. 130-32.  That same day, Dr. Joubert-Curtis adjusted Resper's Vancomycin dosage and noted that Dr. Rufael, an infectious disease specialist at the University of Maryland Medical System, was to be notified of Resper's progress.  *Id*., pp. 133-134.  Resper's lab report returned that day showed no micro-organisms but was positive for bacilli.  *Id*, pp. 139-143.  The following day NP Pierce reviewed Resper's lab report and directed Resper's plan of care, including prescriptions for Vancomycin and Rocephin, continue.  *Id*., p. 144. He continued to have active prescriptions for Neurontin, Ultram, and Tylenol ES. *Id*., p. 145.

On May 21, 2017, Nurse Pierce noted that Resper's condition had improved.  No redness, warmth, or drainage was observed.  ECF No. 35-4, p. 153.  Resper complained that the Neurontin 800 mg twice a day was not controlling his pain.  He was to be discharged from the infirmary that day.  He was prescribed Zyvox (an antibiotic), a tapering dose of Neurontin, and an increasing dose of Cymbalta.  *Id*., pp. 153-56.  Pierce directed that the wound be cleansed with wound cleaner, patted dry, Silvadene applied, covered with a non-stick dressing, and secured with gauze.  Resper agreed to the care plan.  *Id*., p. 153.  However, the prescription for Neurontin tapering was declined by the pharmacist as not specific.  The prescription for Cymbalta was declined as contraindicated with Ultram and the prescription for Zyvox was declined without a culture and sensitivity report. *Id*., p. 156.  The following day, Dr. Barrera prescribed doxycycline 100 mg for 10 days.  *Id*., pp. 157-58.

On May 24, 2017, Resper underwent his annual exam, conducted by NP McLaughlin.  ECF No. 35-4, p. 159.  The exam was unremarkable, other than his left lower leg wound continued to have discharge and pitting edema.  *Id.*, pp. 159-63.  At the time of the exam, Resper had active prescriptions for Neurontin, doxycycline, Tylenol ES, and Ultram. *Id.*, pp. 162-63.

During wound care conducted by NP McLaughlin on June 3, 2017, Resper reported that he had run out of doxycycline and he began taking Bactrim which caused his lips and tongue to swell.  ECF No. 35-4, pp. 164-64.  McLaughlin determined that he was not having a reaction to Bactrim as there was no rash or swelling.  *Id.*  Resper's leg wound was described as 4 x 2 centimeter with cracked dry skin on the medial left foot.  Resper's plan of care, which included application of Silvadene, wound cleanser, and pain medication, was continued.  *Id.*

A few days later, Resper requested that his prescription for Neurontin be renewed.  ECF No. 35-4, pp. 166-69.  NP Mahler explained that a tapering dose of Neurontin has been prescribed but that it was declined due to it being contraindicated with Cymbalta.  The Cymbalta was also declined and as such Mahler ordered Neurontin 800 mg with Nortriptyline (Elavil) 50 mg. However, Resper advised that he had previously tried Nortriptyline and developed a rash.  Mahler advised Resper that the rash was not noted in his records and recommended he try the medication for 30 days.  His prescriptions for doxycycline and Ultram were renewed.  *Id.*

Ibrahim Hanna, M.D., a wound specialist from Bon Secours Hospital evaluated Resper on June 26, 2017, via telemedicine.  ECF No. 35-4, pp. 170-72.  Resper was assessed as suffering from chronic recurrent venous stasis ulcer on his left leg.  *Id.*, p. 170.  At the time of exam, the current ulcer had moderate slough, moderate serious drainage, no cellulitis and measured 5 x 5 centimeters.  *Id.*  Dr. Hanna recommended treating the wound with Santyl (a sterile collagen

ointment used to treat skin ulcers)[5] and an ace wrap.  *Id*., p. 172.  That same day, Resper was also

seen by NP McLaughlin.  *Id*., pp. 173-77.  McLaughlin recorded Hanna's recommendations to use

Santyl, cover with Telfa, and wrap with an ace bandage.  McLaughlin discussed with Resper his

changing the dressing himself but she advised him that medical could cleanse the wound better.

She ordered Santyl.  *Id*.  The following day Resper requested antibiotics but they were not ordered

as his last culture did not show infection.  *Id*.  He had active orders for pain medication.  *Id*., p.

180.

On July 3, 2017, Resper's dressing was changed with Santyl, Telfa, Kerlix and an ace wrap

as directed and the plan of care was continued.  ECF No. 35-4,  pp. 181-182.  The following week

Resper complained of increased discharge and a return of green discharge.  He was evaluated by

NP McLaughlin.  *Id*., pp. 183-84.  Resper complained about the changes to his wound care order

but was reminded that the changes were recommended by Dr. Hanna, a wound care specialist.  *Id*.

Resper also requested to be taken off site for wound care but was advised that his wound would

be managed on site.  He refused to let McLaughlin remove the dressing and was referred to the

Regional Medical Director.  *Id*.  His prescriptions for analgesic medications remained active.  *Id*.,

pp. 183-84.

On July 21, 2017, Resper was again seen by NP McLaughlin.  ECF No. 35-4, pp. 185-86.

He reported that he was using Aquacel AG every day (a silver impregnated antimicrobial

dressing)[6] but was experiencing more drainage from the wound and needed antibiotics.  Dr.

Barrera assured Resper that unnecessarily using antibiotics could lead to increased antibiotic

resistance and that he was scheduled for follow up with the wound care specialist.  *Id*.

---

[5] See https://www.webmd.com/drugs/2/drug-9489/santyl-topical/details (last visited Sept. 1,
2020).
[6] See https://www.drugs.com/drp/aquacel-ag-with-hydrofiber.html (last visited Sept 1, 2020).

On July 24, 2017, Dr. Hanna again assessed Resper.  A moderate amount of necrotic tissue was observed.  ECF No. 35-4, pp.187-89.  "No clear signs of infection other than drainage color" were noted.  *Id*., p. 189.  Dr. Hanna recommended starting doxycycline and placed Resper back on Santyl.  *Id*., p. 189.  The following day Dr. Barrera renewed Resper's prescriptions for doxycycline, Ultram, Neurontin, Ensure, and Santyl.  *Id*., pp. 191-94.

Dr. Joubert-Curtis evaluated Resper on July 26, 2016.  ECF No. 35-4, pp. 195-97.  She recounted that Resper's wound had closed and reopened 7 times.  The wound was then 9.5 cm in length 4.75 cm in width and .25 cm in depth, macerated with a foul odor and serosanguineous drainage.  *Id*.  She noted that the most recent culture indicated it was resistant to "TCN" and possibly would not respond to doxycycline and she would discuss Resper's case with Dr. Rufael.  *Id*., p. 196.  On August 2, 2017, Dr. Joubert-Curtis discontinued the order for doxycycline noting that the wound was not responsive.  *Id*., p. 197-98.  She recommended Resper be treated with IV antibiotics but he declined and Dr. Joubert-Curtis noted she would discuss with the pharmacy the best antibiotic to use intramuscularly.  *Id*., p. 197.  She also submitted a consultation request for a vascular study.  *Id*.  The following day, Dr. Joubert consulted via telemedicine with Dr. Rufael regarding the culture.  *Id*., pp. 199-200.  Dr. Rufael suggested the laboratory report represented colonization and did not recommend antibiotics.  *Id*.  Instead he recommended that a Doppler study of the left lower extremity be conducted with a possible vascular surgeon consultation.  He also recommended an x-ray of the left lower extremity.  *Id*., p. 199.  The wound above Resper's left medial malleolus and left medial foot were described as improved.  *Id*.  Dr. Rufael entered a late note regarding the August 3rd telemedicine appointment assessing Resper as suffering from chronic left lower extremity stasis wound since April of 2017, and confirming his recommendations for an x-ray of the left lower extremity and foot, doppler of the left lower leg

16

and consideration of a vascular surgery consult.  *Id*., p. 201.  Resper's August 3, 2017 left ankle x-ray showed no acute bone abnormality.  *Id*., p. 203.

NP McLaughlin evaluated Resper on August 23, 2017.  ECF No. 35-4, pp. 204-206. Resper requested renewal of his bottom bunk status and an order for front cuffing.  *Id*.  There was no medical need for front cuffing.  McLaughlin noted that a consultation had been placed for venous Doppler of the left lower extremity followed possibly by a consult with a vascular surgeon. *Id*.  Resper's wound care plan with dressing changes continued as did his prescriptions for analgesic pain relief.  *Id*., pp. 204-05.

On August 28, 2017, Resper was again evaluated by Dr Hanna via telemedicine.  ECF No. 35-4, pp. 207-09.  His wound was improving on Santyl with less slough and Dr. Hanna recommended continued use of Santyl and that Resper return for follow up in two months.  *Id*. That same day, McLaughlin noted that Dr. Hanna recommended Resper soak his leg in water for ten minutes, cleanse, scrub gently, place Santyl to edges and cover daily.  Resper was uncooperative with McLaughlin's wound care and refused to let her clean the wound and he wrapped it with an old dressing.  *Id*., p. 210.

On September 8 and 22, 2017, Resper failed to appear at sick call.  ECF No. 35-4, pp. 212-217.

Dr. Getachew evaluated Resper on October 16, 2017 via telemedicine.  ECF No. 35-4, pp. 215-17.  Resper reported that his pain was well controlled with Ultram and Neurontin.  *Id*., p. 215. No swelling was observed in the left leg and the wound was healing with a scar.  *Id*.  There was no sign of infection.  Dr. Getachew directed that wound care would continue and Resper was directed to keep the leg elevated.  *Id*.  His medications were renewed but Dr. Getachew noted that Neurontin was not effective for chronic pain management and its discontinuation would be

evaluated at the next clinical visit.  *Id*.  On October 25, 2017, McLaughlin renewed Resper's Santyl prescription and directed his current wound care be continued.  *Id*. p. 218-219.

On November 8, 2017, Nurse Diaz noted that there was a dressing change order for "santyl to wound site, 4x 4 gauze, wrap with stretch gauze, may use one ace bandage."  ECF No. 35-4, p. 220.  That same date Nurse Miller, after debriding the wound and applying a dressing change, asked the provider to clarify whether the dressing was wet to dry or dry gauze.  *Id*., p. 222.  Resper did not appear for his sick call on November 11, 2017.  *Id*., p. 223.

NP Mahler saw Resper on November 22, 2017.  ECF No. 35-4, p. 224.  At that time, Resper complained that his medications were not renewed but he was advised that his prescriptions remained valid and had not expired.  *Id*., pp. 224-25.

On November 27, 2017, Dr. Hanna again evaluated Resper via telemedicine.  ECF No. 35-4, pp. 226-28.  The wound was significantly improved with no sign of infection.  Dr. Hanna recommended treating with Santyl for two more weeks and then reevaluate by wound care nurse. *Id*., p. 228.  If the base of the wound was clear, Resper could switch to Aquacel AG.  He was directed to follow up in three months.  *Id*.  Additionally Dr. Hanna noted that eventually Resper would "need arterial studies to decide on compression stockings."  *Id*.  The same day NP Mahler recorded Dr. Hanna's recommendations (*id*., pp. 229-30) and the following day placed a consultation request for a wound care nurse.  *Id*., pp. 231-32.

On December 16, 2017, NP Clark evaluated Resper and noted that the width of the wound was closing with a clean red base and the scar tissue on the edges resolved.  ECF No. 35-4, p. 233. Resper was directed to return for follow up in 7 days.  *Id*., pp. 233-35.  He had active prescriptions for wound care and pain medications.  *Id*., p. 234.

Nurse Treuter conducted a telemedicine evaluation regarding wound care on December 21, 2017.  ECF No. 35-4, 236-240  At that time it was recommended that Resper begin Aquacel dressing every three days.  His wound was improved, pink in color, with little to no drainage.  He did complain of pain.  *Id*.  That same day Dr. Joubert-Curtis entered a note after consultation with the wound care nurse recommending discontinuation of Resper's prescription for Aprodine because it could worsen vascular disease but Resper refused.  *Id*.

## DISCUSSION

### I.       Motion for Appointment of Counsel

Resper seeks the appointment of counsel, citing the limits imposed by his incarceration. ECF No. 102.  In civil actions, the Court appoints counsel only in exceptional circumstances.  *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975).  In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim.  *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989).  Exceptional circumstances include a litigant who "is barely able to read or write," *id*. at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008).  Upon consideration of Resper's filings, the Court finds that he has demonstrated the ability either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so.  The Court also finds that, at this stage of the proceedings, there is no need for discovery, expert witnesses, or a hearing.  The request for appointment of counsel is therefore denied.

### II.      Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

In their Motions, the Medical Defendants and Warden Graham seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56.  They argue that:

(1) Resper has failed to state facts sufficient to establish 42 U.S.C. § 1983 claim; (2) Wexford should be dismissed as there is no respondeat superior liability; (3) Resper's claims of negligence are not judicially actionable; (4) Resper cannot produce evidence to show deliberate indifference on the part of the Medical Defendants; (5) Resper's claims do not support punitive damages; and (6) Resper is not entitled to injunctive relief.[7] Warden Graham states that he did not personally participate in the alleged wrongdoing, is entitled to qualified immunity, and Resper has failed to demonstrate deliberate indifference to his medical need.

### A.    Legal Standards

Defendants filed their Motions as a Motion to Dismiss or Alternatively, for Summary Judgment.  To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint."  *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir.

---

[7] Resper's requests for injunctive relief were previously denied by this Court.  *See e.g.* ECF Nos. 15, 45, 63, 70. Additionally, for the reasons that follow, Resper cannot demonstrate a likelihood of success on the merits and is therefore not entitled to injunctive relief.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

2007).  Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded.  Fed. R. Civ. P. 12(d).  Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.* "Reasonable opportunity" has two requirements:  (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion.  *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motions.  To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002).  Resper has not filed an affidavit or declaration under Rule 56(d) or otherwise stated a specific need for discovery.  Therefore, on the issues for which consideration of exhibits is required, the Court will construe the Motions as seeking summary judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*,

346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit

under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute of material fact is only "genuine"

if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict

for that party.  *Id*. at 248-49.

### B.  Warden Graham and Wexford

In the Maryland prison system, inmate medical care is provided by privately contracted

medical care providers.  ECF No. 37-2, p.1, ¶ 2.  There are no allegations and no facts supporting

the claim that Warden Graham, who is not a licensed health care provider, had any personal

involvement in the provision of medical care to Resper or any other inmate.  *Id*.  In a declaration,

Graham states, without dispute, that he has no authority to make decisions relating to an inmate's

medical care or to order the medical staff to prescribe any particular medication or perform any

particular medical procedure.  *Id*.

It is firmly established that the doctrine of vicarious liability, or *respondeat superior*, does

not apply to § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding

that there is no *respondeat superior* liability under § 1983).  Particularly where Warden Graham

was not the supervisor of any of the medical personnel, he can be found liable pursuant to 42

U.S.C. § 1983 only if he participated personally in the deprivation of constitutional rights.  *See

Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Warden Graham did not have any personal

involvement in providing medical care to Resper or even in the decision whether to allow Resper

to see a medical provider.  To the extent that Warden Graham played any role in the review of

Resper's ARPs relating to his medical care, such involvement does not amount to sufficient

personal participation in the denial of medical care to support liability under § 1983.  Rather,

correctional personnel may rely on the judgments of medical providers on the appropriate medical treatment to provide. *Miltier v. Beorn*, 896 F.2d 848, 855 (4th Cir. 1990).

Wexford may also not be held liable under a theory of *respondeat superior*. A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

**C. Eighth Amendment**

Resper asserts a violation of the Eighth Amendment for deliberate indifference to his health based on the failure to adequately treat his leg wound. The Eighth Amendment protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's

serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citations and internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

The record does not support Resper's claim that the Medical Defendants acted with deliberate indifference to his chronic venous stasis ulcer. The Medical Defendants do not contend that Resper's wound did not constitute a serious medical condition, however the evidence does not support a finding that the Medical Defendants acted with an intent to cause harm.          Rather, the records demonstrate a sincere and reasonable effort to address Resper's medical problem.

He was evaluated consistently and repeatedly by nurses, physician's assistants, doctor's and specialists in wound care. To be sure, Resper is understandably frustrated by the recurrence of the wound however the unrefuted record evidence demonstrates that: in August of 2015 the

24

wound on his left lower leg reopened and it was treated with wound care, three times a week, including cleaning the wound and dressing it with an Unna boot, kerlix wrap, and tape.  ECF No. 35-7, p. 2, ¶ 5; ECF No. 35-4.  The wound, while slow in healing scabbed over in May of 2016 but reopened in June.  *Id.*  A wound care nurse was consulted and the wound care was changed to a Telfa pad, the Unna boot, kerlix, and wrap with coban.  *Id.*  Resper received regular wound care throughout 2016.  ECF No. 35-7, p. 2, ¶ 6; ECF No. 35-4.  Later the wound was treated with Silvadene and with weekly debridement and application of silver nitrate.  *Id*  The wound continued to gradually heal with occasional reopening.  *Id.*  In March of 2017 the wound was fully healed. *Id.*  Unfortunately the wound reopened in April.  *Id.*

On occasion the wound became infected.  Resper was treated with oral, intramuscular, and intravenous antibiotics, which resolved the infections.  ECF No. 35-7, p. 2, ¶ 7; ECF No. 35-4. The wound was regularly cultured and the antibiotics prescribed adjusted to resolve the infection.

Resper was also referred to Ibrahim Hanna, M.D. a wound care specialist, whose recommendations regarding treatment with Santyl and covering the wound were put in place by Medical staff.  ECF No. 35-7, p. 3, ¶ 8; ECF No. 35-4.  The protocol was effective and when the wound was almost healed Dr. Hanna recommended Resper switch to wound care using Aquacel AG, which was done. *Id.*

In response Resper's regular complaints of pain he was prescribed Neurontin, Ultram, Nortriptyline, and Tylenol ES.  ECF No. 35-7, p. 3, ¶ 9; ECF No. 35-4.

There is no evidence that Resper has suffered from permanent damage to his left leg from the ulcers or that the recurrent ulcers posed a threat to his life or a threat of amputation.  ECF No. 35-7, p. 3, ¶ 10.

Viewing the evidence in the light most favorable to Resper, the Court cannot find that the

25

Medical Defendants were deliberately indifferent to his needs. Defendants continuously evaluated Resper's condition and resulting pain. None of the Medical Defendants' decisions regarding Resper's care amounted to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 198)). Nor does Resper demonstrate that any delay in responding to sick calls, receiving any prescribed medications, or the occasional failure to provide wound care/dressing changes as prescribed exposed him to a serious or significant injury. *See Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980) (stating that delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent").

Where Medical Defendants and other medical providers gave regular attention to Resper's medical conditions the Court concludes that the record, even viewed in the light most favorable to Resper, does not support a finding that they acted with deliberate indifference to his medical needs. In sum, Resper has not shown that the Medical Defendants exhibited a callous disregard for his serious medical need, *see Estelle*, 429 U.S. at 105-06. Accordingly, the Court concludes that there is no genuine issue of material fact on Resper's Eighth Amendment claims, and the Court will grant the Defendants' Motions as to these claims. The Court need not and does not address Defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or Alternatively, for Summary Judgment are granted. A separate Order shall issue.

Date:  September 21, 2020

                                   /s/
                            PETER J. MESSITTE
                 UNITED STATES DISTRICT JUDGE

27